**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JAMAL PHILLIPS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COVENANT HEALTH, INC., and ST. JOSEPH HOSPITAL NASHUA,<br><br>Defendant. | Case No. 1:26-cv-10131<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jamal Phillips ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself and on information and belief as to all other matters, brings this Class Action Complaint against Defendant Covenant Health, Inc. ("Covenant") and St. Joseph Hospital Nashua ("St. Joseph") (collectively, "Defendants"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this class action on behalf of himself and all other individuals ("class members")—totaling approximately 486,052 people who had their sensitive personal identifiable information ("PII") and protected health information ("PHI")—as defined by the Health Insurance Portability and Accountability Act ("HIPPA")—disclosed to unauthorized third parties that accessed and removed the PII and PHI from Defendants' systems between at least May 18, 2025 to May 26, 2025[1], if not longer (the "Data Breach").

[1] *See Covenant Health, Inc. - Data Breach Notifications*, Office Of The Maine Attorney Gen., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited Jan. 12, 2026).

2. Covenant operates three acute care hospitals, ten skilled nursing facilities, four assisted living facilities, two independent living facilities, 100 physician practices and clinics, and employees, totaling approximately 5,760 employees and providers.[2]

3. Defendants sent letters to certain class members on or about July 11, 2025, and to Plaintiff and additional class members on or about December 31, 2025 ("Notice Letter"), notifying them of the Data Breach and stating that their names, addresses, dates of birth, Social Security Numbers ("PII"), as well as their medical record numbers, health insurance information, and treatment information, such as diagnoses, dates of treatment, and/or type of treatment ("PHI") were compromised in the Data Breach.[3]

4. It has been reported that the Data Breach was a ransomware attack conducted by a ransomware group, Qilin, which claims to have committed the Data Breach.[4] Qilin claims to have stolen 852 gigabytes of data, consisting of 1.35 million files of highly sensitive PII and PHI.[5]

5. Defendants' Notice Letter states that they discovered the Data Breach on May 26, 2025, but Defendants did not notify impacted individuals—including Plaintiff and class members—of the Data Breach until 46 days later, for those notified on July 11, 2025, and 219 days later for those notified on December 31, 2025.[6] Defendants' respective 46- and 219-day delay runs afoul of statements and promises contained in the Privacy Policy on Covenant's website

[2] https://covenanthealth.net/who-we-are/ (last visited January 12, 2026).
[3] A sample draft of Covenant's Notice Letter is accessible at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited January 13, 2026).
[4] https://www.bleepingcomputer.com/news/security/covenant-health-says-may-data-breach-impacted-nearly-478-000-patients/ (last visited January 12, 2026).
[5] *Id.*
[6] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4dcf1642-5813-47f8-8ea9-c4cf6381cdef.html (last visited January 12, 2026) and https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited January 12, 2026).

recognizing that it is "committed to protecting the confidentiality of your health information."[7] Similarly, the Privacy Policy on St. Joseph's website states that it is "required by law to maintain the privacy and security of your protected health information. We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[8]

6. Covenant reported on the Maine Attorney General's website that on July 11, 2025, and December 31, 2025, it sent written notification to approximately 486,052 individuals impacted by the Data Breach and informed them that their PII and PHI was compromised.[9] According to Defendants' July 11, 2025 Notice Letter, on May 26, 2025, Covenant "was alerted to unusual activity in its Information Technology ("IT") environment" and that "[t]hrough that investigation, Covenant Health learned that an unauthorized party gained access to its IT environment on May 18, 2025, and was able to access some patient information."[10] Covenant states further that on June 25, 2025, the "patient information may have included their names and Social Security numbers."[11] Then, in the updated December 31, 2025 Notice Letter, Covenant stated that "[s]ince the July notice . . . Covenant Health continued to analyze the involved data and has completed the bulk of its data analysis. The involved data included patients' names and one or more of the following: addresses, dates of birth, medical record numbers, Social Security numbers, health insurance

---

[7] https://covenanthealth.net/privacy-policy/ (last visited January 13, 2026).

[8] Notice of Privacy Practices for Patients of St. Joseph Hospital, St. Joseph Hospital (A Member of Covenant Health), https://stjosephhospital.com/wp-content/uploads/2025/01/Poster_HIPAA-Notice_SJN.pdf (last visited January 12, 2026).

[9] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited January 13, 2026); *see* https://www.securityweek.com/covenant-health-data-breach-impacts-478000-individuals/.

[10] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4dcf1642-5813-47f8-8ea9-c4cf6381cdef.html (last visited January 12, 2026).

[11] *Id.*

information, and treatment information, such as diagnoses, dates of treatment, and/or type of treatment."[12]

7. Notably, Defendants' Notice Letter wholly omits that the Data Breach involved a ransomware attack by Qilin—a fact highly material to impacted individuals.

8. Defendants owed a duty to Plaintiff and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII and PHI against unauthorized access and disclosure. Specifically, by collecting, maintaining, and/or transferring or otherwise sharing Plaintiff's and class members' PII and PHI with Covenant, St. Joseph owed a duty to safeguard that highly sensitive information. Likewise, by receiving or otherwise maintaining Plaintiff's and Class Members' PII and PHI, Covenant owed a duty to safeguard it. As such, Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII and PHI entrusted to them from unauthorized access and disclosure.

9. As a result of Defendants' inadequate security and breaches of their duties and obligations, the Data Breach occurred, and Plaintiff's and class members' PII and PHI was accessed and disclosed by an unauthorized actor. This instant action seeks to remedy these failings and their consequences. Plaintiff thus brings this complaint on behalf of himself and all similarly situated individuals whose PII and/or PHI was exposed as a result of the Data Breach, which Defendants learned of on or about May 26, 2025, but did not publicly disclose until July 11, 2025, or December 31, 2025.

[12] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited January 12, 2026).

10. Plaintiff, on behalf of himself and all other class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, invasion of privacy, unjust enrichment, violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, seeks declaratory and injunctive relief, monetary damages including punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### A. Plaintiff Jamal Phillips

11. Plaintiff Jamal Phillips is a resident and citizen of the state of New Hampshire and resides in Nashua, New Hampshire.

12. Plaintiff received a letter from Defendants dated December 31, 2025, confirming that his PII and PHI were impacted by the Data Breach. In the letter, Defendants informed Plaintiff that his "name, address, date of birth, medical record number, health insurance information, and/or treatment information, such as diagnoses, dates of treatment, and type of treatment" were compromised in the Data Breach.

13. The letter further stated:[13]

> Please also review the enclosed Additional Steps You Can Take, which contains information on what you can do to better protect against possible misuse of your information. We also recommend that you review the statements you receive from your health insurer. If you see services you did not receive, please contact your insurer immediately.

### B. Defendant Covenant Health, Inc.

14. Defendant Covenant Health is incorporated in Massachusetts, with its principal place of business at 40 Shattuck Road, Ste. 317, Andover, Massachusetts 01810. Covenant Health, Inc. is a citizen and resident of the state of Massachusetts.

---

[13] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3471.

**C. Defendant St. Joseph Nashua**

15. Defendant St. Joseph Nashua is a full-service, not for profit health care system located in New Hampshire and maintains its headquarters and principal place of business 172 Kinsley Street, Nashua, New Hampshire, 03060.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which one or more class members are citizens of states different from Defendants.

17. The Court has personal jurisdiction over Defendants because they maintain their principal places of business in this judicial District, conduct significant business in Massachusetts, and/or otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in Massachusetts.

18. Venue properly lies in this District because, *inter alia,* Defendants maintain their principal places of business in this judicial District; transact substantial business, have agents, and are otherwise located in this District; and/or a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial District.

## FACTUAL ALLEGATIONS

**A. Overview of Defendants**

19. Defendant Covenant is a network of healthcare organizations that include hospitals, skilled nursing and rehabilitation centers, assisted living residences, and community-based health

and elder care organizations.[14]

20. Discovery will show that through its provision of the foregoing services, Covenant obtains possession of its customers'—including Plaintiff's and class members'—highly sensitive PII and PHI. Thus, in the regular course of its business, Covenant collects and maintains the PII and PHI of consumers. Upon information and belief, that information ordinarily includes: patient demographic information (such as patient name, guarantor name, parent/guardian name, address, and date of birth); Social Security Numbers ("SSNs"), and health insurance information, as well as information concerning previous medical care, including diagnoses, dates of treatment, and type of treatment. Defendants store this information digitally in the regular course of business.

21. Covenant's "Privacy Policy" posted on its website assures consumers that it will comply with privacy laws and HIPPA: "Covenant Health is committed to protecting the confidentiality of your health information and meeting the standards set forth in [HIPAA] regulations."[15]

22. Covenant's HIPAA Notice of Privacy Practices states, "We are required by law to maintain the privacy and security of your protected health information," and that it "will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[16]

23. Covenant's Privacy Policy assures consumers that it will not share their sensitive information—which necessarily includes by letting a data breach access it—without first obtaining

---

[14] https://covenanthealth.net/who-we-are/.
[15] https://covenanthealth.net/privacy-policy/ (last visited January 13, 2026).
[16] *See, e.g.*, Notice of Privacy Practices for Patients of St. Joseph Hospital, St. Joseph Hospital (A Member of Covenant Health), https://stjosephhospital.com/wp-content/uploads/2025/01/Poster_HIPAA-Notice_SJN.pdf (last visited January 12, 2026).

the consumers' written consent: "We will not use or share your information other than as described here unless you tell us we can in writing."[17]

24. Yet, contrary to Defendants' website representations—by virtue of Defendants' admission that they experienced the Data Breach which revealed the PII and PHI of nearly 480,000 million individuals—Defendants did not have adequate measures in place to protect and maintain sensitive PII and PHI entrusted to them. Instead, Defendants' websites wholly fail to disclose the truth: that Defendants lack sufficient processes to protect the PII and PHI that is entrusted to them.

## B. The Data Breach

25. Defendants' Notice Letter disclosing the Data Breach states that on May 26, 2025, "Covenant Health was alerted to unusual activity in its Information Technology ('IT') Environment."[18] It further stated that "Covenant Health immediately worked to secure and restore its systems, and it through the investigation, "Covenant Health learned that an unauthorized party gained access to its IT environment on May 18, 2025, and was able to access some patient information."[19] It further states that "[o]n June 25, 2025, Covenant Health learned the information . . . may have included their names and Social Security numbers."[20]

26. Then, on December 31, 2025, Defendants sent an updated Notice Letter. It stated that it supplemented the July 11, 2025 Notice Letter, and that "[s]ince the July notice . . . Covenant Health continued to analyze the involved data analysis. The involved data included patients' names and one or more of the following: addresses, dates of birth, medical record numbers, Social

---

[17] *Id.*
[18] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2817.
[19] *Id.*
[20] *Id.*

Security numbers, health insurance information, and treatment information, such as diagnoses, dates of treatment, and/or type of treatment."[21] Thus, known, malicious, unauthorized cybercriminals had access to Defendants' systems—and Plaintiff's and class members' sensitive PII and PHI stored thereon.

27. The Data Breach resulted from Defendants' failure to adequately protect and safeguard the highly sensitive PII and PHI entrusted to them.

28. Defendants' Notice Letter states that the Data Breach was discovered on May 26, 2025, but Defendants did not notify impacted individuals—including Plaintiff and class members—of the Data Breach for **46 days,** for those that received notice dated July 11, 2025, and **219 days** for those that received notice dated December 31, 2025.[22]

29. Defendants' respective 46- and 219-day delays are contrary to multiple promises on Covenant's website that it is "required by law to maintain the privacy and security of your protected health information," and that it "will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[23]

30. Defendants reported on the Maine Attorney General's website that on July 11, 2025, they sent written notifications to 7,864 individuals, and on December 31, 2025, they sent to written notifications to 478,111 individuals whose PII and PHI were compromised.[24]

[21] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3471.

[22] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4dcf1642-5813-47f8-8ea9-c4cf6381cdef.html (last visited January 12, 2026) and https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited January 12, 2026).

[23] *See, e.g.*, Notice of Privacy Practices for Patients of St. Joseph Hospital, St. Joseph Hospital (A Member of Covenant Health), https://stjosephhospital.com/wp-content/uploads/2025/01/Poster_HIPAA-Notice_SJN.pdf (last visited January 12, 2026).

[24] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4dcf1642-5813-47f8-8ea9-c4cf6381cdef.html (last visited January 12, 2026) and

31. As noted above, it is believed that the Data Breach was a ransomware attack conducted by Qilin, which itself claims to have committed the Data Breach.[25]

32. Qilin claims to have stolen 852 gigabytes of data, consisting of 1.35 million files of highly sensitive PII and PHI it illegally exfiltrated from Defendants' systems.[26]

33. Because the Data Breach was conducted by known, self-proclaimed ransomware cybercriminals, Plaintiff's and class members' sensitive PII and PHI are irrefutably in the possession of known bad actors.

34. Remarkably, noticeably absent from the Notice Letter is any mention, whatsoever, that the Data Breach involved a ransomware attack, or of Qilin.

35. Plaintiff's and class members' PII and PHI compromised in the Data Breach was posted on the dark web for a period of time by Qilin, which constitutes actionable misuse of the entire class's PII and PHI.[27] *See Webb v. Injured Workers Pharmacy, LLC,* 72 F.4th 365, 374 (1st Cir. 2023) (holding Article III is satisfied for all data breach class members when plaintiffs allege any of the compromised data set was misused).

36. As explicitly acknowledged and stated on their own websites, Defendants owed duties to Plaintiff and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII and PHI against unauthorized access and

https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited January 12, 2026).

[25] https://www.bleepingcomputer.com/news/security/covenant-health-says-may-data-breach-impacted-nearly-478-000-patients/ (last visited January 12, 2026).

[26] *Id*.

[27] https://www.hipaajournal.com/covenant-health-cyberattack/ (last visited January 12, 2026) ("The Qilin threat group claimed responsibility for the attack. The group's tactics, techniques, and procedures involve data theft and file encryption with ransomware, and when the ransom is not paid, data is leaked on its dark web data leak site. While Covenant Health was initially listed on the site, the listing has been removed, which indicates the ransom was paid.").

disclosure, and to promptly notify individuals of any breach involving their information. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect PII and PHI from unauthorized access and disclosure.

**C. Defendants Knew that Criminals Target PII and PHI**

37. At all relevant times, Defendants knew, or should have known, their customers' patients', Plaintiff's, and all other class members' PII and PHI were a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and class members' information from cyber-attacks that Defendants should have anticipated and guarded against.

38. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found that there were 1,160 medical data breaches in 2024 with over 305,527,355 million patient records exposed.[28] This is a 26% increase from 2023 in the number of patient records compromised.[29]

39. PII and PHI are valuable property rights.[30] The value of this information as a commodity is measurable.[31] "Firms are now able to attain significant market valuations by

[28] Bluesight, *2025 Breach Barometer*, BLUESIGHT.COM, at 2, https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf (last accessed January 12, 2026).
[29] *Id.*
[30] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data
[31] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited January 12, 2026).

employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[32] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[33] It is so valuable to identity thieves that once PII or PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

40. As a result of the real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

41. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[34] A cyber criminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[35] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did

---

[32] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (January 12, 2026).
[33] Erica Sweeney, *IAB: Companies Will Spend 19.2B on Third-party Data and Solutions in 2018*, Marketing Dive (Dec. 6, 2018), https://www.marketingdive.com/news/iab-companies-will-spend-192b-on-third-party-data-and-solutions-in-2018/543725/ (last visited January 12, 2026).
[34] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[35] *Id.*

not receive in order to restore coverage.[36]

42. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[37] According to a report released by the FBI's Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[38]

43. Criminals can use stolen PII and PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[39] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[40]

44. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[41]

---

[36] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.
[37] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[38] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[39] *What Happens to Stolen Healthcare Data*, *supra* at n.10.
[40] *Id.*
[41] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An*

45. Given these facts, any company that transacts business with a consumer and then compromises the privacy of that consumer's PII or PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

**D. Theft of PII and PHI Has Grave and Lasting Consequences for Victims**

46. Theft of PII and PHI is serious. The FTC warns consumers that identity thieves use PII and PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[42]

47. Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[43] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[44]

---

*Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[42] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Jan. 12, 2026).

[43] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[44] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

48. With access to an individual's PII or PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[45]

49. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[46]

50. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

51. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security

---

[45] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Jan. 12, 2026).
[46] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Jan. 12, 2026).

number and you don't have a credit freeze yet, you're easy pickings."[47]

52. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[48] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[49] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII and PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[50] The FTC also warns, "If the thief's health information is mixed with yours, the medical care you're able to get or the health insurance benefits you're able to use."[51]

53. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought or received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

---

[47] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[48] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf
[49] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.14.
[50] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Jan. 12, 2026).
[51] *Id*.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.
- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.
- Phantom medical debt collection based on medical billing or other identity information.
- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[52]

54. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for a consumer to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[53]

55. It is within this harsh and dangerous reality that Plaintiff and all other class members must now live with the knowledge that their PII and PHI are forever in cyberspace and were taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

**E. Damages Sustained by Plaintiff and the Other Class Members**

56. Plaintiff and all other class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-

[52] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, *supra* at 24.
[53] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

57. Plaintiff brings this action on behalf of himself and the following classes:

> Nationwide Class: All residents of the United States who were notified by Defendants that their PHI and PII may have been compromised as a result of the Data Breach.
>
> New Hampshire Subclass: All residents of New Hampshire who were notified by Defendants that their PHI and PII may have been compromised as a result of the Data Breach.

The foregoing classes are referred to herein, collectively, as the "Class." Excluded from the Class are: (1) the judges presiding over the action, Class Counsel, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

58. **Numerosity**: Class members are so numerous that their individual joinder is impracticable, as the proposed Class includes at least 478,188 members who are geographically dispersed.

59. **Typicality**: Plaintiff's claims are typical of class members' claims. Plaintiff and all class members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the class members he seeks to represent.

60. **Adequacy**: Plaintiff's interests are aligned with the Class he seeks to represent and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and his counsel

intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and undersigned counsel.

61. **<u>Superiority</u>**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other class members' claims. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for class members individually to effectively redress Defendants' wrongdoing. Even if class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

62. **<u>Commonality and Predominance</u>:** The following questions common to all class members predominate over any potential questions affecting individual class members:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and class members' PII and PHI from unauthorized access and disclosure;

b. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and class members' PII and PHI;

c. Whether Defendants breached their duties to protect Plaintiff's and class members' PII and PHI;

d. Whether an implied contract existed between class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure class members' PII and PHI from unauthorized access and disclosure;

e. Whether Plaintiff and all other class members are entitled to damages and the measure of such damages and relief.

63. Given that Defendants engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)

64. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

65. Defendants owed duties to Plaintiff and all other class members to exercise reasonable care in safeguarding and protecting their PII and PHI in Defendants' possession, custody, or control.

66. Defendants knew the risks of collecting, storing, and/or otherwise maintaining Plaintiff's and all other class members' PII and PHI and the importance of maintaining adequate systems, policies, and processes to keep it safe, including from data breaches such as the Data Breach. Defendants knew of the many data breaches that targeted healthcare providers in recent years.

75. Given the nature of Defendants' business, the sensitivity and value of the PII and PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

76. Defendants breached their duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and class members' PII/PHI.

77. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

78. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their PII and PHI would not have been compromised.

79. As a result of Defendants' above-described wrongful actions, inactions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injuries and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the

confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

80. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

82. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII and PHI.

83. Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other class members' PII and PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtain and store, and the foreseeable consequences of a data breach involving PII and PHI including, specifically, the substantial damages that would result to Plaintiff and the other class members.

84. Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

85. Plaintiff and class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

86. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

87. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

88. The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

89. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90. Plaintiff and class members gave Defendants their PII and PHI in confidence, believing that Defendants would protect that information. Plaintiff and class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiff's and class members' PII and PHI created a fiduciary relationship between Defendants and the Class. In light of this relationship, Defendants must act primarily for the benefit of people whose PII and PHI is provided to them, which includes safeguarding and protecting Plaintiff's and class members' PII and PHI.

91. Defendants have a fiduciary duty to act for the benefit of Plaintiff and class members upon matters within the scope of their relationship. They breached that duty by failing to properly protect the integrity of the systems containing Plaintiff's and class members' PII and PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and class members' PII and PHI that was collected.

92. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII and PHI which remains in Defendants'

possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Data Breach on their PII and PHI; and (vii) overpayment for the services that were received without adequate data security.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

93. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. In connection with receiving pharmacy services, Plaintiff and all other class members entered into implied contracts with Defendants.

95. Pursuant to these implied contracts, Plaintiff and class members paid money to Defendants, whether directly or indirectly through their healthcare providers, insurers, and/or state agencies, and provided Defendants with their PII and PHI. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide pharmacy services to Plaintiff and class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and class members' PII and PHI; and (3) protect Plaintiff's and class members' PII and PHI in compliance with federal and state laws and regulations and industry standards.

96. The protection of PII and PHI was a material term of the implied contracts between Plaintiff and class members, on the one hand, and Defendants on the other hand. Indeed, as alleged above, Defendants recognized the importance of data security and the privacy of customers' and serviced individuals' PII and PHI on their websites and in Covenant's Privacy Policy. Had Plaintiff and class members known that Defendants would not adequately protect their PII and PHI, they would not have entrusted their PII and PHI to Defendants.

97. Plaintiff and class members performed their obligations under the implied contract when they provided Defendants with their PII and PHI and paid—directly or through intermediaries—for services from Defendants.

98. Defendants breached their obligations under their implied contracts with Plaintiff and class members in failing to implement and maintain reasonable security measures to protect and secure their PII and PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and class members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards.

99. Defendants' breach of their obligations of their implied contracts with Plaintiff and class members directly resulted in the Data Breach and the injuries that Plaintiff and all other class members have suffered from the Data Breach.

100. Plaintiff and the Class were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or indirectly through their healthcare providers, insurers, and/or state agencies—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII and PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII and PHI has been breached; (v) they were deprived of the value of their PII and PHI, for which there is a well-established national and international market; and/or (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT V**
**INVASION OF PRIVACY**
**(INTRUSION UPON SECLUSION)**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

101. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Plaintiff and class members had a reasonable expectation of privacy in the PII and PHI that Defendants disclosed without authorization.

103. By failing to keep Plaintiff's and class members' PII and PHI safe and disclosing PHI and PII to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and class members' privacy by, *inter alia*:

a. intruding into Plaintiff's and class members' private affairs in a manner that would be highly offensive to a reasonable person;

b. invading Plaintiff's and class members' privacy by improperly using their PHI and PII properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c. failing to adequately secure the PII and PHI from disclosure to unauthorized persons;

d. enabling the disclosure of Plaintiff's and class members' PII and PHI without consent.

104. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and class members' position would consider their actions highly offensive.

105. Defendants knew that their systems and processes for collecting, managing, storing, and protecting PII and PHI entrusted to them were vulnerable to data breaches prior to the Data Breach.

106. Defendants invaded Plaintiff's and class members' right to privacy and intruded into Plaintiff's and class members' private affairs by disclosing their PII and PHI to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

107. As a proximate result of such unauthorized disclosures, Plaintiff's and class members' reasonable expectations of privacy in their PII and PHI were unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and class members' protected privacy interests.

108. In failing to protect Plaintiff's and class members' PII and PHI, and in disclosing that information, Defendants acted with malice and oppression and in conscious disregard of Plaintiff's and class members' rights to have such information kept confidential and private.

109. Plaintiff seeks injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

110. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

111. This claim is pleaded in the alternative to the breach of implied contract claim.

112. Plaintiff and class members have both a legal and equitable interest in their PHI and PII that was collected by, stored by, and maintained by Defendants—thus conferring a benefit upon Defendants—that was ultimately compromised by the Data Breach.

113. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and class members. Defendants also benefitted from the receipt of Plaintiff's and class members' PHI and PII.

114. As a result of Defendants' failure to safeguard and protect PII and PHI, Plaintiff and class members suffered actual damages.

115. Defendants should not be permitted to retain the benefit belonging to Plaintiff and class members because Defendants failed to adequately implement the data privacy and security procedures that were mandated by federal, state, and local laws and industry standards.

116. Defendants should be compelled to provide for the benefit of Plaintiff and class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT VII**
**MASSACHUSETTS GENERAL LAWS, CHAPTER 93A**
**(Against Covenant, On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the New Hampshire Subclass)**

117. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118. M.G.L. ch. 93A § 2 provides that [u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

119. Plaintiff alleges Covenant committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

120. Covenant knew or should have known of the inherent risks in experiencing a data breach if it failed to maintain adequate systems and processes for keeping Plaintiff's and class members PII and PHI safe and secure. Only Covenant was in a position to ensure that its systems were sufficient to protect against harm to Plaintiff and class members resulting from a data security incident such as the Data Breach; instead, it failed to implement such

safeguards.

121. Covenant's own conduct also created a foreseeable risk of harm to Plaintiff and class members and their PII and PHI. Covenant's misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

122. Covenant acknowledges that its conduct created actual harm to Plaintiff and class members because Covenant instructed them to take additional steps and review statements received from Plaintiff and class members' health insurers.

123. Covenant failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiff's and class members' PII and PHI, failed to recognize in a timely manner the Data Breach, and failed to notify Plaintiff and class members in a timely manner that their PII and PHI were accessed in the Data Breach.

124. These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive, unscrupulous, and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

125. As a direct and proximate result of Covenant's unfair acts and practices, Plaintiff and class members have suffered injury and/or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their PII and PHI are used; (ii) the publication and/or fraudulent use of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent

researching how to prevent, detect, contest and recover from identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Covenant's possession (and/or to which Covenant continues to have access) and is subject to further unauthorized disclosures so long as Covenant fails to undertake appropriate and adequate measures to protect the PII and PHI in their continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed Private Information.

126. Neither Plaintiff nor class members contributed to the Data Breach.

127. Plaintiff sent a demand for relief, in writing, to Covenant on January 13, 2026, prior to filing this complaint.

128. Based on the foregoing, Plaintiff and class members are entitled to all remedies available pursuant to M.G.L. ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

**COUNT VIII**
**DECLARATORY RELIEF**
**(28 U.S.C. § 2201)**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the New Hampshire Subclass)**

129. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

130. An actual controversy has arisen and exists between Plaintiff and class members, on the one hand, and Defendants on the other hand, concerning the Data Breach and Defendants' failure to protect Plaintiff's and class members' PHI and PII, including with respect to the issue of

whether Defendants took adequate measures to protect that information. Plaintiff and the Class are entitled to judicial determination as to whether Defendants have performed and are adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff's and class members' PHI and PII from unauthorized access, disclosure, and use.

131. A judicial determination of the rights and responsibilities of the parties regarding Defendants' privacy policies and whether they failed to adequately protect PHI and PII is necessary and appropriate to determine with certainty the rights of Plaintiff and the Class, and so that there is clarity between the parties as to Defendants' data security obligations with respect to PHI and PII going forward, in view of the ongoing relationships between the parties.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of the Class, respectfully requests that the Court grant the following relief:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as Class Representative and undersigned counsel as Class Counsel;

B. Award Plaintiff and the Class actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C. Award declaratory and injunctive relief as permitted by law or equity to assure that class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D. Award Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Award Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Award Plaintiff and the Class such other favorable relief as allowable under law or at equity.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 13, 2026

Respectfully submitted,

/s/Julie Selesnick

Julie Selesnick, BBO 650968
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.559.9740
jselesnick@bergermontague.com

E. Michelle Drake*
Marika K. O'Connor Grant*
Katherine G. Raths*
BERGER MONTAGUE, PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel: (612) 594-5933
Fax: (612) 584-4470
emdrake@bergermontague.com
moconnorgrant@bergermontague.com
kraths@bergermontague.com

Mark B. DeSanto*
BERGER MONTAGUE, PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdesanto@ bergermontague.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff*